**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA |
| v. |
| LONNIE LEROY COFFMAN, |
| Defendant |

Criminal Action No. 21-4 (CKK)

**MEMORANDUM OPINION & ORDER**
(May 24, 2021)

Defendant Lonnie Leroy Coffman is charged with a seventeen-count indictment based on his alleged possession of firearms and ammunition in the District of Columbia, near the United States Capitol on January 6, 2021.  Following his arrest, Mr. Coffman appeared for a detention hearing on January 12, 2021, before Magistrate Judge G. Michael Harvey of the United States District Court for the District of Columbia.  Magistrate Judge Harvey ordered Mr. Coffman detained pending trial.  Mr. Coffman now asks the Court to revoke that order of detention and place him on pretrial release.  Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as whole, the Court will **DENY** Mr. Coffman's [12] Motion for Reconsideration of Detention and Request for Pretrial Release.

---

[1] The Court's consideration has focused on the following documents:
- Indictment, ECF No. 5;
- Def.'s Mot. for Reconsideration of Detention and Request for Pretrial Release, ("Def.'s Mot."), ECF No. 12;
- Gov't Mem. in Opp'n to Def.'s Request for Pretrial Release, ("Gov't Opp'n"), ECF No. 16; and,
- Def.'s Reply to Gov't Opp'n ("Def.'s Reply"), ECF No. 17.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCrR 47(f).

## I.   BACKGROUND

### A.  Factual Background

"On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol."  Aff. in Supp. of Compl., ECF No. 1-1, at 1.  As required by the Constitution, *see* Const. Amend. XII, Congress convened this joint session "to certify the vote count of the Electoral College [from] the 2020 Presidential Election" that "had taken place on November 3, 2020," Aff. in Supp. of Compl., ECF No. 1-1, at 1.  "The joint session began at approximately 1:00 p.m.," with then-Vice President Michael R. Pence "present and presiding in the Senate chamber."  *Id.*

"[A]t approximately 12:47 p.m. on January 6, 2021," moments before the joint session of Congress was to begin, "the United States Capitol Police responded to the report of a possible explosive device in the vicinity of the National Republican Club," located at 300 First Street, Southeast, in Washington, D.C.  *Id.*  Shortly thereafter, the Capitol Police received reports of another "possible explosive device at the Democratic National Committee Headquarters."  *Id.*  The Democratic National Committee Headquarters "is located at 430 South Capitol Street, Southeast, in Washington, D.C.," "approximately three blocks from the National Republican Club."  *Id.*  In response to these threats, the Capitol Police bomb squad arrived in the area and "established a secure perimeter . . . to protect the public and to facilitate the investigation of the possible explosive devices . . . in the vicinity."  *Id.*

While carrying out an investigative sweep for explosives within the secured perimeter, "two United States Capitol Police officers observed the handle of what appeared to be a firearm on the front right passenger seat of" an unattended "red GMC Sierra 1500 pickup truck" with an Alabama license plate.  *Id.*  "A law enforcement database check of the vehicle registration revealed that the vehicle was registered to Lonnie L. Coffman with a home address in Falkville, Alabama."

*Id.* After checking the vehicle's registration, the investigating officers then carried out a complete search of Mr. Coffman's truck, including both the cab of the truck and the bed of the truck, which was covered with a "fabric top." *Id.*

Through their search of Mr. Coffman's vehicle, the Capitol Police recovered a substantial cache of weaponry. Specifically, the investigating officers identified a loaded 9mm Hi-Point handgun; a loaded Windham Weaponry rifle; a loaded Hatfield Gun Company SAS shotgun; several large-capacity ammunition feeding devices loaded with more than ten rounds of ammunition; hundreds of rounds of ammunition; a crossbow with bolts; several machetes; camouflage smoke devices; and a stun gun. *See* Detention Order, ECF No. 8, at 3; Gov't Opp'n, Ex. C, ECF No. 15-3, at 1–14. "According to records checks of the National Firearms Registration and Transfer Record database" none of these weapons were registered to Mr. Coffman. Aff. in Supp. of Compl., ECF No. 1-1, at 2–3. Moreover, Mr. Coffman had not registered any of these firearms in accordance with District of Columbia law. *Id.* at 3.

In the bed of Mr. Coffman's truck, law enforcement officers also recovered eleven mason jars containing a flammable liquid, with a hole punched in the top of each jar, along with lighters and rags. *See* Detention Order, ECF No. 8, at 3; Gov't Opp'n, Ex. C, ECF No. 15-3, at 14. Bomb technicians observed that the liquid-filled mason jars, lighters, and rags "appeared to be consistent with components for an explosive or incendiary device known as a 'Molotov Cocktail'" and contained an "igniting substance . . . consistent with gasoline." Aff. in Supp. of Compl., ECF No. 1-1, at 1–2. Mr. Coffman later informed law enforcement officers himself that these mason jars also contained "melted Styrofoam and gasoline." *Id.* at 3. "An explosive enforcement officer with the Bureau of Alcohol Tobacco Firearms and Explosives [subsequently] advised that melted Styrofoam and gasoline [is] an explosive mixture that has the effect of napalm insofar as it causes

the flammable liquid to better stick to objects that it hits upon detonation." *Id.*

Through their search of Mr. Coffman's vehicle, the investigating officers also recovered various handwritten notes. One of these handwritten notes contained a quote attributed to Abraham Lincoln, stating: "We The People Are The Rightful Masters Of Both The Congress And The Courts, Not To Overthrow The Constitution But To Overthrow The Men Who Pervert The Constitution." Gov't Opp'n, Ex. I, ECF No. 15-9, at 1. Included beneath this quote was a list, which explicitly named one federal judge, designated as a "bad guy," and a Democratic member of the House of Representatives, specifically identified as ████████████████████ ████"[2] *Id.* Additionally, another handwritten note found within Mr. Coffman's vehicle listed the names and supposed contact information of "Conservative Talk Show Host Mark Levin," "Shaun Hannity," and "Senator Ted Cruz." *Id.* at 2. Investigating officers recovered all of this evidence from Mr. Coffman's unattended vehicle on the day of January 6, 2021.

Mr. Coffman, himself, attempted to return to his vehicle at approximately 6:30 PM on the evening of January 6, 2021. *See* Aff. in Supp. of Compl., ECF No. 1-1, at 2. He had departed from his truck around 9:15 AM that morning, traveling alone towards the United States Capitol, *see* Gov't Opp'n, Ex. B, ECF No. 15-2, at 1–3; *see also* Aff. in Supp. of Compl., ECF No. 1-1, at 3, and photographic evidence shows that he had gathered with a crowd in the vicinity of the Capitol Building during the day, *see* Gov't Opp'n, Ex. B, ECF No. 15-2, at 3. As Mr. Coffman headed back towards his vehicle, however, he was intercepted by law enforcement officers on the 400 block of First Street, Southeast. *See* Aff. in Supp. of Compl., ECF No. 1-1, at 2. Mr. Coffman

---

[2] To preserve the safety of the public figures named within Mr. Coffman's lists, the Court has redacted personally identifying information that might draw unwanted and threatening attention to those individuals. The Court makes these redactions in an exercise of its discretion, based upon the heightened interests of these public figures in maintaining their personal security. *See United States v. Hubbard*, 650 F.2d 293, 316–17 (D.C. Cir. 1980).

identified himself to the officers as "Lonnie" and stated that he was returning to his nearby vehicle, which he described as "a red pickup truck." *Id.* The officers asked Mr. Coffman "if he had any weapons on his person, and he responded that he had a gun in his right front pants pocket." *Id.* Accordingly, the officers searched Mr. Coffman and recovered a "9mm Smith & Wesson handgun," another "22 caliber derringer style handgun," and two sets of "GMC vehicle keys." *Id.* "Both sets of keys matched" the red pickup truck searched by law enforcement earlier that day "and were capable of unlocking its door." *Id.*

During their search of Mr. Coffman, the investigating officers "also recovered a wallet from [his] person." *Id.* The wallet "contained an Alabama driver's license with the name Lonnie Leroy Coffman and the same address in Falkville, Alabama that was returned from database check of the vehicle registration for the red GMC Sierra Pickup." *Id.* Also within Mr. Coffman's wallet was a miscellaneous piece of paper with the contact information for an individual identified by law enforcement as a member of a militia group from Southeast Texas, known as the "American Patriots." *See* Gov't Opp'n, Ex. E, ECF No. 15-5, at 1–2. The same paper from Mr. Coffman's wallet also featured an address from Brownsville, Texas. *See id.* at 2. Law enforcement subsequently identified this address as the site of "Camp Lonestar," a reported gathering place for Texas militia groups that patrol the border for illegal aliens. *See id.* at 1–2. In 2014, the Federal Bureau of Investigation ("FBI") had previously identified Mr. Coffman as a participant at Camp Lonestar, where he was armed with a "crack barrel 12 gauge shotgun and a 9mm pistol." *Id.*, Ex. G, ECF No. 15-7, at 4.

Mr. Coffman was ultimately arrested following law enforcement's search of his vehicle and person on January 6, 2021. *See* Arrest Warrant, ECF No. 3, at 1. Following his arrest, law enforcement conducted further investigation into Mr. Coffman. First, a court-authorized search of

a GPS tracking device found in Mr. Coffman's truck revealed that Mr. Coffman had previously traveled to Washington, D.C., on December 11, 2020.  *See* Gov't Opp'n, Ex. I, ECF No. 15-10, at 1–7.  This GPS tracking device also showed that, on December 11, 2020, Mr. Coffman drove around the United States Capitol and attempted to drive to the residence of Senator Ted Cruz.  *Id.* The Capitol Police further discovered that on December 11, 2020, Mr. Coffman had called the Senate office of Senator Ted Cruz.  *See id.*, Ex. K, ECF No. 15-11, at 1–3.  Internal records from Senator Cruz's office summarized Mr. Coffman's call:

> Man says that he went to [Senator Cruz's] DC home to visit him with no answer at the door, and then called to try to arrange a meeting with him over the phone. Directed him to the scheduler's email address. He is also looking for contact info for S. Hannity, M. Levin, and R. Limbaugh.

*Id.* at 2.  A staff ███████ from Senator Cruz's office further explained to the United States Capitol Police that Mr. Coffman had seemed "unbalanced" or "not 100% there" during the call.  *Id.* at 1. While Mr. Coffman "did not seem threatening" on the phone, his comments "were odd enough to record."  *Id.*  The staff ██████ also noted that Mr. Coffman seemed "to be coming from the 'friend' angle in wanting to . . . help with the election fraud he saw."  *Id.*

On January 26, 2021, law enforcement officers also conducted a court-authorized search of Mr. Coffman's Alabama residence.  During the search, officers recovered an additional set of liquid-filled mason jars with hole-punched lids, matching those found in Mr. Coffman's truck on January 6, 2021.  *See id.*, Ex. L, ECF No. 15-12, at 1.  Furthermore, law enforcement officers recovered from Mr. Coffman's residence multiple rifles, ammunition, *see id.* at 2–5, and documents related to a militia group called the "Southwest Desert Militia," *see id.*, Ex. M, ECF No. 15-13, at 1–2.  Additionally, the officers identified another handwritten list within Mr. Coffman's residence, which stated: "Use White Pages To Locate People."  *Id.* at 3.  That list then named specific individuals, along with corresponding descriptions transcribed next to their names.

These descriptions included, for example: "ex Dem. Senator, traitor," "Billionaire left[i]st, traitor," "radical Dem. Senator," "billionaire oilman & fund-raiser for Obama," ███████████ ███ and "G.E., Obama's lap dog." *Id.* at 3.

Finally, law enforcement conducted investigative interviews with members of Mr. Coffman's family following the events of January 6, 2021. *See id.*, Ex. N, ECF No. 15-14, at 1–8. During these interviews, Mr. Coffman's family explained that Mr. Coffman was an Army veteran who had served two tours during the Vietnam War. *See id.* at 4. Mr. Coffman "often spoke about the difficulty he had dealing with the experiences from the war" and also "dealt with depression." *Id.* at 5. In 2008, Mr. Coffman separated from his wife, *see id.* at 2, and one family member reported that Mr. Coffman "became a hermit after he separated from his wife," *id.* at 6. In a January 17, 2021 interview, Mr. Coffman's ex-wife stated that Mr. Coffman "was very closed mouth about what he did" and "acts without communicating." *Id.* at 1. She also explained that Mr. Coffman "would leave the state at random times for extended periods," without telling his family "where [he] went, why he left, or what he was doing." *Id.*

**B. Procedural Background**

On January 7, 2021, the government charged Mr. Coffman by criminal complaint with a violation of 26 U.S.C. 5861(d), for the possession of an unregistered "destructive device," and for a violation of D.C. Criminal Code 22-4504(a), for "[c]arrying a pistol without a license." Compl., ECF No. 1, at 1. On January 11, 2021, a grand jury returned a seventeen-count indictment, charging Mr. Coffman with one count of Possession of an Unregistered Firearm – Destructive Device (26 U.S.C. Section 5861(d)), three counts of Carrying a Pistol Without a License (22 D.C. Code Section 4504(a)), two counts of Carrying a Rifle or Shotgun (22 D.C. Code Section 4504(a-1)), one count of Possession of a Large Capacity Feeding Device (7 D.C. Code Section

2506.01(b)), five counts of Possession of an Unregistered Firearm (7 D.C. Code Section 2502.01(a)), and five counts of Unlawful Possession of Ammunition (7 D.C. Code Section 2506.01(a)(3)). *See* Indictment, ECF No. 5, at 1–6.

On January 12, 2021, Mr. Coffman appeared for a detention hearing before Magistrate Judge G. Michael Harvey of the United States District Court for the District of Columbia. Applying the analysis required by the Bail Reform Act, Magistrate Judge Harvey found "by clear and convincing evidence that no condition or combination of conditions of release" for Mr. Coffman "would reasonably assure the safety of any other person and the community." Detention Order, ECF No. 8, at 2. Accordingly, Magistrate Judge Harvey ordered Mr. Coffman to remain detained pending trial. *See id.* at 4. On April 30, 2021, Mr. Coffman filed a motion requesting this Court to reconsider Magistrate Judge Harvey's detention order and release Mr. Coffman pending trial, under conditions. *See* Def.'s Mot. at 1. The government has opposed Mr. Coffman's motion, *see* Gov't Opp'n at 1, which is now ripe for the Court's review.

## II.   LEGAL STANDARD

A defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment to the order" with "the court having original jurisdiction over the offense." 18 U.S.C. § 3145(b). "Although the D.C. Circuit has not ruled on the matter, every circuit to consider the issue has found that a magistrate judge's detention order is subject to *de novo* review." *United States v. Padilla*, No. CR 21-214 (JDB), 2021 WL 1751054, at *4 (D.D.C. May 4, 2021) (citing *United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017) (referencing cases from the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits that support this proposition). This Court has also adopted a *de novo* standard for the review of a magistrate judge's detention order. *See United States v. Riggins*, 456 F. Supp. 3d 138, 142 (D.D.C.

2020).

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)).  Accordingly, under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting *Salerno*, 481 U.S. at 747).  "Hence, a detention hearing must be held only if a case involves certain enumerated categories of offenses, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, *id.* § 3142(f)(2)(A)–(B)." *United States v. Klein*, No. CR 21-236 (JDB), 2021 WL 1377128, at *3 (D.D.C. Apr. 12, 2021).

If the Bail Reform Act authorizes a detention hearing, the Court must then evaluate whether any "condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1)).  "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *Munchel*, 991 F.3d at 1279 (quoting *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019)).  "To assess a defendant's dangerousness and risk of flight, the court must 'take into account the available information' concerning four statutory factors [set forth in the Bail Reform Act]: (1) 'the nature and circumstances of the offense charged,' (2) 'the weight of the evidence against the person,' (3) 'the history and characteristics of the person,' and (4) 'the nature and seriousness of the danger to any person or the community that would be posed by the person's release.'" *Padilla*, 2021 WL 1751054, at *4 (quoting 18 U.S.C. § 3142(g)(1)–(4)).

"To justify detention on the basis of dangerousness, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'" *Munchel*, 991 F.3d at 1279–80 (18 U.S.C. § 3142(f)). This requires the government to prove "by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community." *Id.* (quoting *Salerno*, 481 U.S. at 751). Alternatively, "[w]hen the basis for pretrial detention is the defendant's risk of flight, the government is required to demonstrate the appropriateness of detention . . . by a preponderance of the evidence." *United States v. Sabol*, No. CR. 21-35-1 (EGS), 2021 WL 1405945, at *4 (D.D.C. Apr. 14, 2021) (citing *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996)).

### III.   DISCUSSION

For the reasons set forth below, the Court determines that the government has adequately shown that Mr. Coffman's pretrial detention is justified under the Bail Reform Act. Accordingly, the Court will **DENY** Mr. Coffman's [12] Motion for Reconsideration of Detention and Request for Pretrial Release.

### A.  Qualification for a Detention Hearing

As a threshold matter, the Court must determine whether Mr. Coffman is eligible for a pretrial detention hearing under the Bail Reform Act. *See* 18 U.S.C. § 1342(f); *Klein*, 2021 WL 1377128, at *3. Here, the Court concludes that Mr. Coffman is eligible for a detention hearing under § 1342(f)(1)(E) of the Bail Reform Act. Section 1342(f)(1)(E) provides that the Court "shall" hold a detention hearing, upon the government's motion, in a case including "any felony . . . that involves the possession or use of a firearm or destructive device . . . or any other dangerous weapon . . . " 18 U.S.C. § 1342(f)(1)(E); *see also Munchel*, 991 F.3d at 1281 ("Under 18 U.S.C.

10

§ 3142(f)(1)(E), detention is permitted if the case involves any felony . . . that involves the *possession* or use of a . . . dangerous weapon.") (quotation omitted).

The felony charges in Mr. Coffman's Indictment meet this standard.  Count One of the Indictment, for example, charges Mr. Coffman with the unregistered possession of Molotov cocktails, defined as a "destructive device," in violation of the 26 U.S.C. § 5861(d).  Indictment, ECF No. 5, at 1–2; *see also* 26 U.S.C. § 5845(f) (defining "destructive device").  This felony charge alone is sufficient to trigger a detention hearing under § 1342(f)(1)(E) of the Bail Reform Act.  Mr. Coffman, moreover, does not dispute his eligibility for a detention hearing under the Bail Reform Act based on the offenses charged in his Indictment.  Accordingly, the Court concludes that the pretrial detention hearing under the Bail Reform Act in this case was appropriate.

## B.  Danger to the Community

Next, the Court considers whether Mr. Coffman's pretrial detention is justified on the basis of his danger to the community.  Under the Bail Reform Act, pretrial detention is appropriate where the government proves "by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'"  *Munchel*, 991 F.3d at 1279–80 (quoting 18 U.S.C. § 3142(f)).   To determine whether the government has satisfied this standard, the Court applies the four factors set forth in § 3142(g) of the Bail Reform Act.  *See id.* (citing 18 U.S.C. § 3142(g)(1)–(4)).

### 1.  Nature and Circumstances of the Offenses Charged

The nature and circumstances of the offenses charged in this case weigh heavily in favor of pretrial detention.  *See* 18 U.S.C. § 3142(g)(1).  Even setting aside, for a moment, the broader context of January 6, 2021, Mr. Coffman's alleged offense conduct in this case remains undoubtedly serious.  First, the Indictment charges Mr. Coffman with felony offenses for the

unlawful possession of multiple handguns, a rifle, and a loaded shotgun—weapons that each carry lethal capacity.  *See* Indictment, ECF No. 5, at 1–6; Detention Order, ECF No. 8, at 2.  In addition to these firearms, the Indictment also charges Mr. Coffman with the unlawful possession of a "large capacity ammunition feeding device."  Indictment, ECF No. 5, at 3.  And perhaps most notably, the Indictment charges Mr. Coffman with the unlawful possession of eleven Molotov cocktails, incendiary objects that qualify as "destructive devices."  *See id.* at 1–2; 26 U.S.C. § 5845(f).  Mr. Coffman himself admitted to law enforcement that these incendiary devices contained "melted Styrofoam and gasoline," which is "an explosive mixture that *has the effect of napalm* insofar as it causes the flammable liquid to better stick to objects that it hits upon detonation."  Aff. in Supp. of Compl., ECF No. 1-1, at 3 (emphasis added).  There is no benign purpose for possessing this comprehensive collection of lethal weapons.  Needless to say, the possession of such destructive weaponry is a serious matter.

The severity of Mr. Coffman's allegedly unlawful weaponry, however, is further compounded by the nature of his possession.  To begin, Mr. Coffman stored his multiple firearms, ammunition-feeding device, and Molotov cocktails together in his pickup truck, along with a variety of supplemental weaponry, such as a crossbow with bolts, several machetes, camouflage smoke devices, and a stun gun.  *See* Detention Order, ECF No. 7, at 3; Gov't Opp'n, Ex. C, ECF No. 15-3, at 1–14.  Mr. Coffman also transported this substantial cache of weaponry over a significant distance, from Alabama into the District of Columbia.  *See* disc. *supra* at § I.A.  And once in the District of Columbia, Mr. Coffman parked his weapons-filled vehicle on the 300 block of First Street, Southeast, an area proximate to personal residences and numerous government buildings, including the United States Capitol.  *See* Detention Order, ECF No. 8, at 2.  Transporting an arsenal of firearms, ammunition, machetes, a crossbow, and Molotov cocktails designed to

mimic napalm, into a populous urban area, is conduct of an even more dangerous and serious nature.

Finally, Mr. Coffman's offense conduct in this case clearly *did not* occur in a vacuum. Instead, Mr. Coffman's actions took place on January 6, 2021, in conjunction with the attack on the United States Capitol that unfolded that day.  To evaluate the full "nature" of Mr. Coffman's offense conduct in the context of January 6, the Court employs the persuasive framework set forth by Chief Judge Beryl Howell in *United States v. Chrestman*, which considers whether the defendant: (1) "has been charged with felony or misdemeanor offenses"; (2) "engaged in prior planning before arriving at the Capitol"; (3) carried or used a dangerous weapon during the riot; (4) "coordinat[ed] with other participants before, during, or after the riot"; (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct"; and (6) the nature of "the defendant's words and movements during the riot," including whether he "damaged or attempted to damage federal property," "threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot."  *United States v. Chrestman*, — F. Supp. 3d —, 2021 WL 765662, at *7–8 (D.D.C. Feb. 26, 2021).

These factors convincingly demonstrate the full severity of Mr. Coffman's offense conduct on January 6.  First, Mr. Coffman's seventeen-count Indictment charges him with numerous felony offenses.  *See* Indictment, ECF No. 5, at 1–6.  Next, the record evidence strongly indicates that Mr. Coffman "engaged in prior planning before arriving at the Capitol" and "came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process, mandated under the U.S. Constitution, of counting and certifying Electoral College votes."  *Chrestman*, 2021 WL 765662, at *8.  For example, GPS tracking showed that Mr. Coffman previously traveled to the

District of Columbia in December 2020 to drive around the United States Capitol.  *See* disc. *supra* at § I.A.  And during that same December trip, Mr. Coffman attempted to contact Senator Ted Cruz about his concerns over purported "election fraud."  *See id.*  Moreover, on the day of January 6, 2021, law enforcement recovered handwritten notes from Mr. Coffman's vehicle, referencing the need to "Overthrow The Men Who Pervert The Constitution."   Gov't Opp'n, Ex. I, ECF No. 15-9, at 1.  This same note also listed the name of a Democratic member of the House of Representatives, and specifically identified that member as ███████████████████████████

██████  *Id.*  Such evidence, in conjunction with the vast array of weaponry Mr. Coffman brought with him to Washington, D.C., convincingly demonstrates Mr. Coffman's planned intentions to disrupt the business of Congress on January 6, 2021.

Furthermore, there is also record evidence to suggest that Mr. Coffman personally participated in the January 6, 2021 riots at the Capitol, while he was armed.  Specifically, visual evidence shows Mr. Coffman departing his vehicle around 9:15 AM on January 6, 2021, traveling alone towards the United States Capitol.  *See* Gov't Opp'n, Ex. B, ECF No. 15-2, at 1–3; *see also* Aff. in Supp. of Compl., ECF No. 1-1, at 3.  Photographic evidence from that day then later shows Mr. Coffman gathered with a crowd in the vicinity of the Capitol building.  *See* Gov't Opp'n, Ex. B, ECF No. 15-2, at 3.  Moreover, when law enforcement searched Mr. Coffman later that evening as he returned to his truck, they recovered a "9mm Smith & Wesson handgun" and a "22 caliber derringer style handgun" on his person.  Aff. in Supp. of Compl., ECF No. 1-1, at 2.  Taken together, this evidence strongly suggests that Mr. Coffman was at least proximate to the dangerous Capitol riots on January 6, 2021, while carrying two loaded firearms.

Lastly, it is noteworthy that on January 6, 2021, Mr. Coffman was also carrying contact information for an individual identified by law enforcement as a militia group member from

Southeast Texas.  *See* Gov't Opp'n, Ex. E, ECF No. 15-5, at 1–2.  This evidence is further

contextualized by Mr. Coffman's prior association with militia groups from Texas, *see id.*, Ex. G,

ECF No. 15-7, at 4 (showing 2014 FBI reports), and the recovery of militia-related documents

from his residence, *see id.*, Ex. M, ECF No. 15-13, at 1–2.  This evidence indicates that Mr.

Coffman had potential plans to coordinate with other members of the January 6, 2021 riots at the

United States Capitol.  *See Chrestman*, 2021 WL 765662, at *8.  The substantial cache of deadly

weapons stored in Mr. Coffman's vehicle, parked nearby the Capitol, only reinforces the

conclusion that Mr. Coffman had larger ambitions of collaboration on January 6.

In sum, the record evidence outlined above convincingly demonstrates that the nature of

Mr. Coffman's offense conduct in this case is overwhelmingly serious.  In particular, Mr.

Coffman's prior trip to Washington, D.C. in December 2020, his concern over perceived election

fraud, his focus on a specific member of the House of Representatives, and, of course, the vast

array of deadly weapons he possessed on January 6, speak to "the gravity of the charged offense,

as a premeditated component of an attempt to halt the operation of our democratic process."

*Chrestman*, 2021 WL 765662, at *8.  Accordingly, § 3142(g)(1) of the Bail Reform Act weighs

decidedly in favor of Mr. Coffman's pretrial detention.

### 2.  Weight of the Evidence

The second factor under the Bail Reform Act turns on the "weight of the evidence" against

Mr. Coffman.  18 U.S.C. § 3142(g)(2).  In applying this factor, some courts have considered the

weight of the evidence in support of the government's case against the defendant, *see United States

v. Johnson*, 212 F. Supp. 3d 126, 129–30 (D.D.C. 2016), while other courts have considered the

weight of the evidence showing that the defendant is a danger to the community, *see United States

v. Hunt*, 240 F. Supp. 3d 128, 134 (D.D.C. 2017); *United States v. Whitton*, No. CR 21-35-5 (EGS),

2021 WL 1546931, at *10 (D.D.C. Apr. 20, 2021).  Regarding this dichotomy, one court in this jurisdiction persuasively reasoned that "the correct approach lies somewhere between these poles." *United States v. Taylor*, 289 F. Supp. 3d 55, 66 (D.D.C. 2018).

In this case, there is compelling record evidence supporting both the government's specific case against Mr. Coffman and demonstrating more broadly the danger Mr. Coffman presents to the community.  As to the former, the government has presented clear photographic evidence showing Mr. Coffman's truck on January 6, 2021 and the specific weapons stored therein.  *See* Gov't Opp'n, Ex. C, ECF No. 15-3, at 1–14.  There is also strong record evidence demonstrating that the truck and its contents belonged to Mr. Coffman and remained under his direct control on January 6, 2021.  *See* Aff. in Supp. of Compl., ECF No. 1-1, at 2.  This evidence convincingly supports the government's case against Mr. Coffman for the unlawful possession of certain weapons, as charged in the Indictment.  *See* Indictment, ECF No. 5, at 1–6.  Next, the government has also proffered robust record evidence demonstrating the danger Mr. Coffman presents to the community.  As discussed throughout this Memorandum Opinion & Order, the government has presented credible evidence of Mr. Coffman's possession of numerous lethal weapons, his ties to militia groups, a prior trip Mr. Coffman made to Washington, D.C. to pursue concerns over "election fraud," and lists Mr. Coffman kept identifying the names of specific Democratic officials, accompanied by concerning commentary.  *See* disc. *infra* at § III.B.4 (discussing danger to the community).  The government has also demonstrated Mr. Coffman's intention to "Use [the] White Pages To Locate People," evidence that further corroborates the danger Mr. Coffman presents to the community.  Govt' Opp'n, Ex. M, ECF No. 15-13, at 3.  For these reasons, the Court concludes that the "weight of the evidence" against Mr. Coffman favors pretrial detention under the Bail Reform Act.  18 U.S.C. § 3142(g)(2).

### 3.   History and Characteristics of Defendant

Next, the Court considers Mr. Coffman's personal history and characteristics.  *See* 18 U.S.C. § 3142(g)(3).   Specifically, the Court focuses on Mr. Coffman's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."  *Id.* § 3142(g)(3)(A).  The Court also considers "whether, at the time of the current offense or arrest, [Mr. Coffman] was on probation, on parole, or on other release."  *Id.* § 3142(g)(3)(B).

Certain of these factors weigh in Mr. Coffman's favor.  As an initial matter, Mr. Coffman is a 71-year old Army veteran with no criminal history, attributes which support his request for pretrial release.  *See* Def.'s Mot. at 1; Pretrial Services Rep., ECF No. 4, at 1.  Moreover, Mr. Coffman has proffered evidence to the Court indicating that he suffers from various medical ailments, including ███████████████████████████████████████████ ██████████████████████████████  *See* Def.'s Mot., Ex. 3, ECF No. 12-3, at 3.  Mr. Coffman's medical records also show ██████████████████████, *see id.*, a fact further supported by statements from his family members given to the FBI, *see* Gov't Opp'n, Ex. N, ECF No. 15-14, at 5.  Finally, Mr. Coffman argues that detention at the District of Columbia Jail places him at risk of contracting COVID-19, a matter of heightened concern given his age.  *See* Def.'s Mot. at 7–8.  Collectively, these factors weigh in Mr. Coffman's favor under § 3142(g)(3).

The record, however, also contains countervailing evidence under § 3142(g)(3).   For example, the government has proffered evidence showing that Mr. Coffman is estranged from his family and has been reported to leave his home for extended periods of time without alerting family members in advance.  *See* Gov't Opp'n, Ex. N, ECF No. 15-14, at 1–8.  Moreover, the government

has provided evidence demonstrating Mr. Coffman's prior connection with militia groups in Texas. In particular, Mr. Coffman previously came to the attention of the FBI in 2014 due to his presence at a militia compound in Texas, where he was in possession of multiple firearms. *See id.*, Ex. G, ECF No. 15-7, at 4. These factors raise questions about Mr. Coffman's community ties and his willingness to engage in armed paramilitary activity.

Finally, while the Court remains cognizant Mr. Coffman's health-related concerns, the record also reflects certain mitigating factors. First, Mr. Coffman's medical records come from the D.C. Jail itself and, therefore, demonstrate that Mr. Coffman has been receiving medication and medical treatment during his pretrial detention period. *See, e.g.*, Def.'s Mot., Ex. 3, ECF No. 12-3, at 1–6. And, as the government notes, Mr. Coffman has not raised any specific complaints about the medical treatment he has received at the D.C. Jail. *See* Gov't Opp'n at 10. Similarly, while COVID-19 remains a public health concern, there are encouraging signs showing that conditions are improving. For example, the General Counsel of the D.C. Department of Corrections reported to the Court on May 14, 2021 that no current residents tested positive for COVID-19 (out of nearly 1,500 total inmates at the D.C. Department of Corrections). Moreover, only two new residents tested positive for COVID-19 upon intake and were subsequently placed in isolation to undergo a quarantine period. Furthermore, COVID-19 vaccines are now available to inmates at the jail and have been administered to a growing number of the jail's population. The efficacy of these vaccines is supported by the Center for Disease Control and Prevention's May 13, 2021 guidance, which explains "that fully vaccinated people no longer need to wear a mask or physically distance in any setting," except as otherwise required by existing laws, regulations, or workplace guidance. *See* Interim Public Health Recommendations for Fully Vaccinated People, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (May 13,

2021).

For the reason set forth above, the Court concludes that Mr. Coffman's personal history and characteristics, including his stated medical concerns, are in equipoise. Accordingly, the Court finds the § 3142(g)(3) factor under the Bail Reform Act does not definitively weigh in favor or against pretrial detention for Mr. Coffman.

### 4. Nature and Seriousness of the Danger

The final factor for the Court to consider under the Bail Reform Act is the "nature and seriousness of the danger" posed by Mr. Coffman's release. 18 U.S.C. § 3142(g)(4). Here, the Court conducts a *prospective* analysis, focusing on whether Mr. Coffman's release presents an "identified and articulable threat to an individual or the community." *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021) (quotation omitted).

The government has shown, by clear and convincing evidence, that Mr. Coffman's release would present an identifiable and articulable threat to the community. As described above, the evidence in this case displays a concerning pattern of deliberate conduct. First, the government has proffered evidence that Mr. Coffman traveled to Washington, D.C. in December 2020, during which time he drove around the United States Capitol and attempted to drive to the home of Senator Ted Cruz. *See* Gov't Opp'n, Ex. I, ECF No. 15-10, at 1–7. Mr. Coffman then called Senator Cruz's office to discuss concerns over perceived "election fraud." *See id.*, Ex. K, ECF No. 15-11, at 1–3. Staffers at Senator Cruz's office noted that Mr. Coffman seemed "unbalanced" or "not 100% there." *Id.* at 1.

Following this December 2020 trip, Mr. Coffman traveled back to Washington, D.C. on January 6, 2021, bringing with him a substantial cache of dangerous weaponry. These weapons included a 9mm Hi-Point handgun; a loaded Windham Weaponry rifle; a loaded Hatfield Gun

Company SAS shotgun; several large-capacity ammunition feeding devices loaded with more than ten rounds of ammunition; hundreds of rounds of ammunition; a crossbow with bolts; several machetes; camouflage smoke devices; and a stun gun.  *See* Detention Order, ECF No. 8, at 3; Gov't Opp'n, Ex. C, ECF No. 15-3, at 1–14.   Mr. Coffman also stored eleven Molotov cocktails in his truck, *id.* at 14, each of which contained "an explosive mixture that has the effect of napalm," Aff. in Supp. of Compl., ECF No. 1-1, at 3.   Additionally, Mr. Coffman was personally armed with two firearms on January 6, 2021, and photographic evidence from that day shows Mr. Coffman in a crowd around the United States Capitol.  *See* Gov't Opp'n, Ex. B, ECF No. 15-2, at 1–3.  On the day of the Capitol riots, Mr. Coffman was also in possession of a handwritten note referencing the need to "Overthrow The Men Who Pervert The Constitution." *Id.*, Ex. I, ECF No. 15-9, at 1.  Collectively, this evidence raises serious concerns about Mr. Coffman's desire and ability to engage in politically motivated violence—armed with a substantial array of lethal weapons—to defend against perceived "election fraud."

This disconcerting picture is reinforced by even more record evidence.  Through investigative searches of both Mr. Coffman's vehicle and his Alabama residence, law enforcement officers recovered multiple handwritten lists, which identified specific Democratic officials and public figures by name.  *See* disc. *supra* at 4–6.  By way of example, it is particularly alarming that on the day of January 6, 2021, Mr. Coffman was in possession of a handwritten note listing the name of a Democratic member of the House of Representatives, and identifying that member ███████████████████████████ Gov't Opp'n, Ex. I, ECF No. 15-9, at 1. Moreover, at his residence in Alabama, Mr. Coffman had yet another list identifying additional Democratic figures, along with disparaging commentary next to their respective names.  *Id.*, Ex. M, ECF No. 15-13, at 3.  This evidence of lists of political officials and public figures, along with

Mr. Coffman's access to significant weaponry and his demonstrated ability to travel to Washington, D.C., raises serious concerns about Mr. Coffman's intentions and the danger he presents to the community.  The fact that Mr. Coffman has already attempted to drive to the Washington, D.C. home of Senator Ted Cruz, *see id.*, Ex. K, ECF No. 15-11, at 2, and also planned to "Use [the] White Pages To Locate People," *Id.*, Ex. M, ECF No. 15-13, at 3, only enhances the credibility of this threat.

Finally, the danger posed by Mr. Coffman's release is further compounded by record evidence showing his militia ties and his possession of additional weaponry at his Alabama residence.  In 2014, the FBI identified Mr. Coffman as a participant at Camp Lonestar, a reported gathering place for Texas militia groups that patrol the border for illegal aliens.  *See id.*, Ex. G, ECF No. 15-7, at 1–4.   At Camp Lonestar, Mr. Coffman was armed with a "crack barrel 12 gauge shotgun and a 9mm pistol."  *Id.* at 4.   In his motion, Mr. Coffman attempts to downplay any such militia connections, but on the day of January 6, 2021 itself, Mr. Coffman was carrying the contact information for an individual identified by law enforcement as a member of a militia group from Southeast Texas, known as the "American Patriots."  *See id.*, Ex. E, ECF No. 15-5, at 1–2.   Mr. Coffman was also in possession of an address from Brownsville, Texas, which law enforcement linked to Camp Lonestar.  *See id.* at 2.  Furthermore, a subsequent search of Mr. Coffman's Alabama residence revealed documents related to yet another militia group called the "Southwest Desert Militia," *see id.*, Ex. M, ECF No. 15-13, at 1–2.   And lastly, a search of Mr. Coffman's Alabama residence revealed an additional supply of firearms, ammunition, and liquid-filled mason jars in the same form as the Molotov cocktails Mr. Coffman transported to Washington, D.C. on January 6, 2021.  *See* disc. *supra* at 6.  This evidence shows Mr. Coffman's association with armed paramilitary operations, as well as his possession of additional weaponry at his residence in

Alabama.  Such evidence only further enhances the credible threat posed to the community by Mr. Coffman's release.

As set forth above, the record contains a variety of compelling evidence demonstrating Mr. Coffman's preparation for the events of January 6, 2021, his possession of substantial weaponry, his militia connections, and his specific targeting of political figures, all of which demonstrate a concrete and prospective threat to the community posed by Mr. Coffman's release.  Mr. Coffman has proposed restrictive home detention conditions in Alabama, including random searches of his home and phone, as well as GPS monitoring.  *See* Def.'s Mot. at 10.  The Court, however, is not persuaded that such conditions will sufficiently address the substantial danger Mr. Coffman poses to the community, described above in detail.  Notably, the record evidence shows that Mr. Coffman possessed a large amount of weaponry and ammunition at his residence in Alabama.  *See* disc. *supra* at 6.  Mr. Coffman also has limited family ties and has a history of unannounced travel, factors which further militate against the efficacy of home confinement.  *See* Gov't Opp'n, Ex. N, ECF No. 15-14, at 1–8.  Accordingly, the Court is unconvinced that any conditions of release for Mr. Coffman will reasonably assure the safety of the community.

****

For the reasons set forth above, the Court concludes that the government has shown by clear and convincing evidence that no condition or combination of conditions of release for Mr. Coffman will reasonably assure the safety of the community.  The Court will, therefore, **DENY** Mr. Coffman's [12] Motion for Reconsideration of Detention and Request for Pretrial Release.

## C.  Risk of Flight

The Bail Reform Act separately authorizes pretrial detention where the government proves, by a preponderance of the evidence, that the defendant poses a serious risk of flight.  *See* 18 U.S.C.

§ 3142(f)(2)(A); *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).   In assessing a defendant's flight risk, the Court considers the same four factors under the Bail Reform Act used to determine a defendant's "dangerousness" to the community.  *See Vasquez-Benitez*, 919 F.3d at 550–51 (citing 18 U.S.C. § 3142(g)(1)–(4)).

In opposition to Mr. Coffman's [12] Motion, the government contends that Mr. Coffman's pretrial detention is also justified because of the flight risk he presents.  *See* Gov't Opp'n at 7.  The Court agrees.  To begin, the serious charges brought against Mr. Coffman in his seventeen-count Indictment, along with the substantial term of imprisonment those charges potentially carry, demonstrate a heightened flight risk in this case.  *See* Indictment, ECF No. 5, at 1–6; *United States v. Padilla*, No. CR 21-214 (JDB), 2021 WL 1751054, at *11 (D.D.C. May 4, 2021).  Similarly, there is compelling photographic evidence in the record that supports the government's charges against Mr. Coffman for the unlawful possession of weapons, *see* Gov't Opp'n, Ex. C, ECF No. 15-3, at 1–14, a factor that also shows an enhanced risk of flight.  Next, the Court again notes that Mr. Coffman has tenuous family and community ties, along with a demonstrated history of unannounced and prolonged periods of travel.  *See id.*, Ex. N, ECF No. 15-14, at 1–8.  For example, Mr. Coffman's ex-wife stated to the FBI that Mr. Coffman "would leave the state at random times for extended periods," without telling his family "where [he] went, why he left, or what he was doing."  *Id.* at 1.  Finally, the Court also finds Mr. Coffman's militia-group ties to be relevant to the flight risk he poses.  In particular, the record shows that Mr. Coffman has previously traveled across state lines to a militia gathering Camp Lonestar in Texas, where he stayed for an extended period of time.  *See id.*, Ex. G, ECF No. 15-7, at 1–4.

Collectively, this material in the record demonstrates by a preponderance of the evidence that there are no conditions of release that will reasonably assure Mr. Coffman's appearance.  This

finding supplies another basis for Mr. Coffman's pretrial detention under the Bail Reform Act.

## IV.    CONCLUSION

For the reasons set forth in this Memorandum Opinion & Order, the Court finds, by clear and convincing evidence, that no condition or combination of conditions will reasonably assure the safety of any other person and the community were Mr. Coffman to be released pending trial. 18 U.S.C. § 3142(e)(1).  The Court further finds, by a preponderance of the evidence, that no condition or combination of conditions will reasonably assure Mr. Coffman's appearance as required if he were to be released pending trial.  *Id.*  The Court, therefore, **DENIES** Mr. Coffman's [12] Motion for Reconsideration of Detention and Request for Pretrial Release.

**SO ORDERED.**

**Date**: May 24, 2021

　　　　　　　　　　　　　　　　_/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

24